**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEREMY R., on behalf of JAMES R., who is deceased,[1] | ) ) | No. 23 CV 4888 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| FRANK BISIGNANO, Commissioner of Social Security, | ) ) | |
| | ) | June 9, 2026 |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

James R. sought disability insurance benefits based on a combination of physical and mental impairments he said prevented him from working. His son Jeremy became the substitute party after James died in May 2022. (Administrative Record ("A.R.") 15, 185-86.) Jeremy brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying James's application for benefits. For the following reasons, Jeremy's remand request is granted:

**Procedural History**

James filed his benefits application in June 2021 claiming disability onset on March 31, 2019. (A.R. 15, 260-66.) After James's application was denied at the administrative level, (id. at 78-82, 90-94), he sought and was granted a hearing, (id.

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Jeremy's and James's first names and last initials in this opinion to protect their privacy to the extent possible.

at 115-20).  But James died before his February 2023 hearing, so his son Jeremy and a vocational expert testified before the Administrative Law Judge ("ALJ").[2]  (Id. at 34-59.)  The ALJ concluded later that month that James was not disabled.  (Id. at 15-28.)  After the Appeals Council denied Jeremy's request for review, (id. at 1-6), he sought judicial review, and the parties consented to this court's jurisdiction, 28 U.S.C. § 636(c); (R. 8).

## Analysis

Jeremy argues that the ALJ failed to: (1) properly evaluate his father's subjective symptom statements; (2) accept state agency psychologist Dr. Steven Fritz's worksheet assessing moderate limitations in concentration, persistence, and pace ("CPP") and social interaction; (3) take into account treating psychiatrist Dr. Mary Cherian's opinion; and (4) develop the record by seeking updated VA records.  (See generally R. 18, Pl.'s Br.)  When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted).  This deferential standard precludes the court from reweighing evidence or substituting its judgment for the ALJ's, allowing reversal

---

[2]  Under 20 C.F.R. § 404.957(c)(4), an ALJ may dismiss a hearing request if the claimant dies, but an eligible survivor can seek to replace the claimant if a hearing request is made within 60 days of the dismissal.  *See* SSA's Program Operations Manual System HA 01240.035.

"only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021), and "provide an explanation . . . that is 'sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review,'" *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). Viewing the record under this standard, remand is warranted.

## A.    Symptom Evaluation

The court turns first to Jeremy's complaint that the ALJ offered "very little evidence" as to how he assessed James's symptom statements in function reports and as Jeremy reported at the administrative hearing because that analysis informs several other aspects of the ALJ's decision, including the residual functional capacity ("RFC") assessment. (R. 18, Pl.'s Br. at 14-16.) An ALJ's symptom evaluation is entitled to great deference and may be reversed only where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). The ALJ must consider factors like medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors. SSR 16-3p, No. SSA-2015-0055, 2017 WL 5180304, at *3 (Oct. 25, 2017). That said, the court will not disturb a subjective symptom evaluation that is logically based on specific findings and evidence. *See Murphy*, 759 F.3d at 815-16.

The ALJ briefly summarized Jeremy's testimony that his father "traveled independently and [] lived on his own" during the relevant period, "regularly cared for his grandchild," "often [sat] in a dark room, dozing off possibly due to sleep apnea or depression," and "struggled with mental health concerns, including depression and PTSD," leading him to "spen[d] most of his days in bed unless he had 'responsibilities.'" (A.R. 21.) The ALJ followed this summary with "boilerplate" language discrediting the symptom allegations, (see R. 18, Pl.'s Br. at 14-15), without providing any evaluation of such statements or factors that must be considered, such as daily activities or treatment, *see* SSR 16-3p, 2017 WL 5180304, at *3. In other words, the ALJ did not discuss why statements describing James's "symptoms or activities were not supported by the evidence." (R. 32, Pl.'s Reply at 11.)

As Jeremy argues, the government "sidesteps these concerns" and asserts that Jeremy "ask[s] the court to make [] perfect the enemy of the good." (Id.) While it is true that the ALJ's analysis need not be perfect, it must "say enough to enable a review of whether the ALJ considered the totality of [James's] limitations," *Lothridge*, 984 F.3d at 1233, and provide a sufficient explanation "to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings," *Warnell*, 97 F.4th at 1054 (internal citations omitted). The ALJ's symptom evaluation here does not satisfy these standards.

Particularly troubling is the fact that the ALJ's summary of the objective medical evidence appears to accept findings that are consistent with subjective symptoms James and Jeremy reported. (See A.R. 21-25.) For instance, the ALJ

4

acknowledged that James was admitted to the hospital in May 2019 for stress and depression with "passive suicidal ideations" and that he "reported two prior traumatic experiences" associated with his military service. (Id. at 21-23 (citing id. at 572); see also id. at 257 (April 2023 letter from James's attorney stating that James experienced "severe depression and PTSD due to repressed military sexual trauma," which was "later referred to as 'rape[]'" by a sergeant).) Although James's "mood, sleep, and general appearance improved" during this hospital stay, the ALJ noted that later in the month James presented as "slightly malodorous and sad-appearing, with occasional tearfulness" and reported that "he had stayed in bed most of the weekend." (Id. at 23 (citing id. at 1365); but see id. at 23 (citing id. at 2283 (ALJ noting that despite "stay[ing] in bed most of the weekend," James was able to enjoy "dinner and a movie" with family)).)

The ALJ continued that the following month, in June 2019, James's "mood and affect were depressed" and he experienced "passive suicidal ideation for the next few months," despite having an "otherwise normal mental status examination" ("MSE"). (Id.) The ALJ remarked that James's providers "frequently described his thinking as tangential or said that he had moderately impaired concentration beginning in August 2019" and that throughout 2019 James's treatment records showed "depressed mood and affect." (Id. (citing e.g., id. at 825 (May 2021 hospital record noting depression and anxiety)).). And the ALJ "considered [James's] history of passive suicidal ideation, with at least one long-term residential program for PTSD [in May 2021] and several emergency room visits for depression" when evaluating the

5

objective medical evidence. (Id. at 24; see also id. at 61-63, 73 (noting at the initial level of administrative review James's history of depression, diagnosis of major depressive disorder, and PTSD, as well as "[n]ightmares, suicidal thoughts, extreme anxiety and depression").) Given that such evidence seems to support symptom allegations James and Jeremy reported—including statements that James "struggled with mental health concerns, including depression and PTSD," leading him to "spen[d] most of his days in bed," (id. at 21)—the court cannot say that the ALJ provided a symptom analysis logically based on substantial evidence. *See Murphy*, 759 F.3d at 815-16.

Jeremy also contends that the ALJ improperly "omitted discussion of [James's] consistent employment and earnings history as a correctional officer for the State of Illinois," further "bolster[ing] the need for remand." (R. 18, Pl.'s Br. at 15-16.) The Seventh Circuit has "observed that a 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'" *Hill v. Colvin,* 807 F.3d 862, 868 (7th Cir. 2015). However, an ALJ's "silence" regarding the claimant's work history "is not enough to negate the substantial evidence supporting the adverse credibility finding." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016); *see also Summers v. Berryhill*, 864 F.3d 523, 528-29 (7th Cir. 2017) ("Although a consistent work history weighs in favor of a positive credibility finding, it is still just 'one factor among many, and it is not dispositive.'" (quoting *Loveless*, 810 F.3d at 508)). Nevertheless, because remand is required for the reasons

6

explained above, on remand the ALJ should address whether and how James's work history impacts his ultimate decision.

**B.     Mental RFC**

Jeremy asserts that the ALJ failed to account for state agency psychologist Dr. Fritz's worksheet findings—assessing moderate CPP and social interaction limitations—when assigning James's mental RFC. (See R. 18, Pl.'s Br. at 6-10.) An RFC measures the tasks a person can perform given his limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When developing the RFC, the ALJ must incorporate a claimant's limitations, including those that are not severe, and may not dismiss a line of evidence that is contrary to the ruling. *Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020). In so doing, the ALJ must "say enough to enable review of whether she considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), providing a "logical bridge" between the evidence and her conclusions, *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

The ALJ found that Jeremy had the mental RFC to "persist on non-complex tasks and maintain occasional interaction with co-workers, supervisors, and the public." (A.R. 21.) In so finding, the ALJ considered James's history of suicidal ideation, residential treatment for PTSD, ER visits for depression, and moderate limitations in the paragraph B areas of CPP and social functioning. (Id. at 24-25.) The ALJ also relied on Dr. Fritz's opinions, which he deemed "considerably

persuasive" because they were "supported by clinical findings and consistent with adaptive functioning." (Id.) Dr. Fritz opined in relevant part that James has "the cognitive capacity at the initial level of administrative review to perform and sustain three to four step tasks that require some skills but do not require complex duties of a routine and repetitive type" and "limited social tolerance[,] therefore [he] would do best in a socially undemanding and restricted setting that requires reduced interpersonal contact, away from the public." (Id.) His worksheet notes moderate limitations in James's ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and work in coordination with or in proximity to others without being distracted by them, as well as limitation in James's ability to interact appropriately with the general public. (Id. at 66-67.)

However, the ALJ found no support for Dr. Fritz's three-to-four-step-task restriction because James "drove and cared for himself and his grandchild without assistance" and performed other multi-step tasks. (Id.) He also rejected Dr. Fritz's working-with-the-public restriction because James traveled and interacted with other members in telephonic group therapy. (Id.) Jeremy argues that these errors warrant remand. (R. 18, Pl.'s Br. at 6-8.)

The government responds that the RFC "substantially captured Dr. Fritz's opined limitations and [the ALJ] reasonably explained his minor departures" therefrom. (R. 27, Govt.'s Mem. at 4.) "[S]ome latitude with the exact wording of the RFC" is required, the government says, so long as necessary limitations are included.

(Id.)  The problem here is that the RFC does not account for James's moderate CPP or social interaction limitations other than restricting him to "non-complex tasks" and "occasional interaction with co-workers, supervisors, and the public."  (A.R. 21.)  And while the ALJ rejected Dr. Fritz's opinions pertaining to these functional areas, he did not explain how or whether he accounted for Dr. Fritz's worksheet findings or the portion of Dr. Fritz's opinion limiting James to "routine and repetitive" tasks in the RFC he assessed.  (See id. at 21, 25.)

Starting with CPP deficits, the ALJ offered some explanation for rejecting the three-to-four-step-task limitation but did not clarify how the daily activities he noted—driving, caring for a grandchild and himself, and performing "other multi-step tasks as described elsewhere," (id. at 25)—translate to an ability to perform more than three-to-four-step tasks.  Nor did the ALJ identify the "other" multi-step tasks to which he referred.  (Id.)  Even assuming the ALJ supplied substantial evidence to support his rejection of the three-to-four-step-task limitation, he did not explain how a non-complex task restriction accommodates the moderate difficulties Dr. Fritz identified in his worksheet—maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, and working in coordination with or in proximity to others without being distracted by them.  (See id. at 66-67.)  The ALJ also failed to explain why he rejected Dr. Fritz's findings that tasks be of "a routine and repetitive type,'" (id.), both of which address James's ability "to stick with a given

task over a sustained period" as opposed to his ability to "do tasks of a given complexity." (R. 32, Pl.'s Reply at 2; see also A.R. 25.)

The government claims that any error here is harmless because Dr. Fritz "provided an extended narrative demonstrating that he did not intend his worksheet ratings to suggest further limitations beyond those the ALJ assessed." (R. 27, Govt.'s Mem. at 7.) For example, Dr. Fritz said that James "retains sufficient attention and concentration to persist at and complete work activities for the usual periods required in the general work force" and "has the capacity for adequate pace and perseverance to maintain a schedule and on time attendance." (Id. (citing id. at 67).) Even so, the ALJ failed to account for CPP deficits other than non-complex tasks, despite Dr. Fritz's opinion endorsing moderate limitations in several CPP categories and his limiting James to tasks of "a routine and repetitive type." (A.R. 66-67.) Without any reasoning as to why the ALJ excluded those limitations in the RFC, the court cannot uphold the ALJ's assessment.

The government insists that the ALJ's RFC is not erroneous because "non-complex" work can be construed as "simple" work, and "a limitation to non-complex work is consistent with the ability to perform work involving three-to-four-step tasks." (R. 27, Govt.'s Mem. at 4-5.) The government cites *Surprise v. Saul*, 968 F.3d 658, 660-61 (7th Cir. 2020), for support. But the assessed RFC in *Surprise* limited the claimant to "work that's considered routine, repetitive, noncomplex, [and] simple." *Id.* The same is not true here, where the mental RFC was limited only to

10

"non-complex tasks." (A.R. 21.) *Surprise* is therefore not helpful for the government's position.

The ALJ also failed to clarify how an occasional social interaction restriction accommodates James's moderate limitation in interacting appropriately with the general public. (Id. at 66.) Dr. Fritz opined that James has "limited social tolerance" and "would do best in a socially undemanding and restricted setting that requires reduced interpersonal contact, away from the public." (Id. at 67.) The ALJ rejected this limitation, adopting instead a limitation allowing for "occasional interaction with co-workers, supervisors, and the public" because he said James could travel and participate in telephonic group therapy. (Id. at 21, 25.) But the evidence shows that during a family trip in April 2021 James experienced significant "anxiety and hypervigilance" and "stayed in [the] room the whole time." (Id. at 913, 2646; see also id. at 897, 1681 (noting that in May 2021 James suffered chest pain after being on a flight and he stayed in the airplane bathroom during the flight trying to calm himself).) On another occasion, James took a "trip" to Cincinnati for residential treatment but had to cut it short after his brother was murdered. (Id. at 614.) The ALJ did not explain how such travel experience or James's ability to engage in telephonic group therapy supplies substantial evidence to support the ALJ's social interaction limitation. In any event, the ALJ does not square Dr. Fritz's finding that James has a moderate limitation in interacting with the general public with the RFC he assessed—limiting James to occasional social interaction with the public.

(Compare id. at 21 with id. at 66.) As such, the ALJ failed to supply substantial evidence to support the assessed mental RFC.[3]

## C.      Opinion Evidence

Jeremy complains that the ALJ did not properly evaluate treating psychiatrist Dr. Cherian's opinions. (R. 18, Pl.'s Br. at 10-14.) An ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, he must assess the persuasiveness of all medical opinions by considering and explaining the most important factors— supportability and consistency. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires consideration of the objective medical evidence and explanations presented and used by the medical source, 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), while the consistency factor directs the ALJ to assess how the opinion is consistent with all other medical and nonmedical sources, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ also may, but is not required to, explain how he considered the medical source's specializations and relationship with the claimant and any other factors that

---

[3] Jeremy further contends that the ALJ failed to consider the effects of James's obesity when assessing his physical RFC. (R. 18, Pl.'s Br. at 9-10.) However, the ALJ determined that James's obesity qualified as a severe impairment and found at step three that James was "clinically obese, with a Body Mass Index (BMI) around 50." (A.R. 18-19 (noting that James had bariatric surgery, suggesting that "obesity impacted his mobility and functioning to a significant degree").) But the ALJ determined that James's obesity "did not cause or contribute to listing-level functional limitations in any affected body system." (Id. at 19.) Given this analysis, the ALJ adequately considered the effects of James's obesity. (See id. at 25 (citing id. at 62, 64-65 (state agency physician's finding that James could perform light work despite his obesity and other physical impairments)).)

tend to support or contradict the source's opinion. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2).

Dr. Cherian's January 2021 opinion was limited to the assertion that James was "unable to work" because he suffered from major depressive disorder and PTSD. (A.R. 405 (noting clinical findings of suicidal ideation and mood dysregulation, as well as treatment with Zoloft and BuSpar).) However, "[a] claimant . . . is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Instead, "the Commissioner is charged with determining the ultimate issue of disability." *Id.* (citing 20 C.F.R. § 404.1527(e)). As such, the ALJ did not err when finding Dr. Cherian's opinion unpersuasive. (See A.R. 25.)

**D. VA Records**

Finally, Jeremy contends that the ALJ failed to abide by his duty to develop the record by requesting and obtaining updated records from Hines and Jesse Brown VA Medical Centers, including records related to James's death. (R. 18, Pl.'s Br. at 13-14.) In his decision, the ALJ said he requested "medical evidence of the source identified as the place of death, Jesse Brown VA Medical Center," but "the source had nothing to produce." (A.R. 18; see also id. at 2782-83 (reflecting the ALJ's request for VA medical records).) The government claims the ALJ's efforts were reasonable, as evidenced by the fact that even Jeremy's attorney was unable to secure the missing VA records. (R. 27, Govt.'s Mem at 11.) The court agrees with the government on this point because while it is unclear whether the ALJ made a "follow-up request to

13

obtain the medical evidence necessary to obtain a determination," 20 C.F.R. 404.1512(b)(i), there is nothing more for him to do when the VA says it has nothing to produce, as noted in the decision.

## Conclusion

For the foregoing reasons, Jeremy's remand request is granted. This matter is remanded for further proceedings.

ENTER:

Young B. Kim
United States Magistrate Judge

14